JEFFREY L. HOGUE (SBN 234557)
jhogue@hoguebelonglaw.com
TYLER J. BELONG (SBN 234543)
tbelong@hoguebelonglaw.com

**HOGUE & BELONG**
3555 5th Ave., Ste. 300
San Diego, California 92103
Telephone: (619) 238-4720
Facsimile: (619) 238-5260

BRYCE A. DODDS (SBN 283491)
bdodds@brycedoddslaw.com
**THE LAW OFFICE OF BRYCE A. DODDS**
120 Birmingham Drive, Suite 250-B
Cardiff-by-the-Sea, CA 92007
Tel. No. (760) 593-7353

Attorneys for Plaintiffs and all others similarly situated

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

MARC PHELPS, an individual; BROOKE BENNER, an individual; and ROES 1 through 100 inclusive;

Plaintiffs,

v.

AIR-GP LLC, a California limited liability company; APARTMENT INCOME REIT, L.P., a Delaware limited partnership; APARTMENT INCOME REIT LLC, a Delaware limited liability company; APARTMENT INCOME REIT CORP., a Maryland corporation; OP PROPERTY MANAGEMENT, L.P., a Delaware limited partnership; and DOES 1 through 500, inclusive,

Defendants.

CASE NO.: 2:25-cv-04894- (MSB)

(Removed From Los Angeles County Superior Court, Case No. 25STCV12012)

**JURY DEMAND**

**THIRD AMENDED CLASS ACTION COMPLAINT**

1. Violation of California Civil Code § 1950.5

## JURISDICTION

1. The courts of the State of California have jurisdiction over the claims for relief asserted herein pursuant to Article 6, Section 10 of the Constitution of the State of California, which grants the Superior Courts of the State of California "original jurisdiction in all causes except those given by statute to other courts." The statutes under which this action is brought do not specify any other basis for jurisdiction over Plaintiffs' (defined below) claims to another court.

2. The courts of the State of California have jurisdiction over all defendants because upon information and belief, each defendant is a resident of California, has sufficient minimum contacts in California, and/or otherwise intentionally avails themselves of the California market so as to render the courts of the State of California jurisdiction over them consistent with traditional notions of fair play and substantial justice.

## VENUE

3. Venue of this civil action is properly fixed in Los Angeles, California, pursuant to Sections 395 and 395.5 of the California Code of Civil Procedure because the acts herein complained of occurred in the County of Los Angeles, and Plaintiff's resulting injuries were sustained there. Further, Defendants own and operate real property in California, including within the County of Los Angeles, from which the allegations in this suit arise.

## CERTAIN AVERMENTS UPON INFORMATION AND BELIEF

4. The averments of fact contained within certain paragraphs of this Complaint are made upon information and belief, which may be grounded in whole or in part upon matters discovered through investigation conducted by the undersigned counsel.

## PARTIES

5. Plaintiff MARC PHELPS ("Mr. PHELPS") is an individual, a resident of Orange County, and a citizen of the State of California who resided at one of the Defendants' APARTMENT COMPLEXES (defined below) in Los Angeles County during all relevant times.

6. Plaintiff BROOKE BENNER ("Ms. BENNER") is an individual, a resident of San Diego County, and a citizen of the State of California who resided at one of the Defendants' APARTMENT COMPLEXES in San Diego County during all relevant times.

7. Plaintiffs ROES 1 through 100 are former tenants of one or more of the Defendants (defined below) herein, who, though not yet identified, are similarly situated to the above-named Plaintiffs, and who may serve as additional class representatives. The true names of Plaintiffs ROES 1 through 100 will be added to this complaint when their identities become known. Hereinafter plaintiffs MARC PHELPS and BROOKE BENNER, and unidentified plaintiff ROES 1 through 100 shall be collectively called "Plaintiffs."

8. Defendant APARTMENT INCOME REIT, L.P. (hereinafter "AIR LP") is a Real Estate Investment Trust organized as a Delaware limited partnership, with its principal address located at 4582 South Ulster Street, Suite 1700, Denver CO 80237. According to its 2024 10-K AIR LP, "[AIR LP] is focused on the ownership and operation of stabilized multi-family properties located in top markets [. . .]."

9. Defendant AIR-GP LLC (hereinafter "AIR LLC") was at time of filing a California limited liability company, with its principal address located at 4582 South Ulster Street, Suite 1700, Denver CO 80237.

10. AIR LLC is the general partner of AIR LP. AIR LLC's is managed by AIR REIT SUB 2, LLC. AIR REIT SUB 2, LLC is managed by APARTMENT INCOME REIT CORP., a Maryland corporation.

11. Defendant APARTMENT INCOME REIT LLC (hereinafter "AIR REIT LLC") is a Real Estate Investment Trust organized as a Delaware limited liability company, with its principal address located at 4582 South Ulster Street, Suite 1700, Denver CO 80237. Plaintiffs are informed and believes defendant AIR REIT LLC's Manager is Losa Cohn. AIR REIT LLC holds itself as responsible for the aircommunities.com website, through which it advertises and offers available apartments.

12. Defendant OP Property Management, L.P., a Delaware limited partnership ("OP Management") manages all of AIR's (defined below) California properties, identified below.

13. Defendants AIR LP, AIR LLC, AIR REIT LLC, and OP Management collectively do business as "AIR Communities" (hereinafter "AIR"). AIR, along with DOE Defendants shall be referred to as "Defendants."

14. AIR owns and operates apartment communities across the United States, including more than 75 properties, averaging approximately 356 units per property, across multiple states, including California. AIR publicly holds itself out as "the owner and operator of best-in-class apartment communities across the United States [and] professionally manages high-quality properties in most major markets [. . .]."

15. This case involves exclusively California-based apartment complexes owned and operated by AIR. The APARTMENT COMPLEXES that are exclusively owned, managed, controlled and operated by AIR are as follows:

1. "**3400 Avenue of the Arts**," a multi-dwelling residential apartment complex with approximately 770 units generally located at 3400 Avenue of the Arts, Costa Mesa, CA 92626.
2. "**707 Leahy**," a multi-dwelling residential apartment complex with approximately 110 units generally located at 707 Leahy Street, Redwood City, CA 94061.

3. "**Broadcast Center**," a multi-dwelling residential apartment complex with approximately 279 units generally located at 7660 Beverly Blvd., Los Angeles, CA 90036.

4. "**Hidden Cove Apartments**," a multi-dwelling residential apartment complex with approximately 334 units generally located at 910 Del Dios Road, Escondido, CA 92029.

5. "**HillCreste Apartment Homes**," a multi-dwelling residential apartment complex with approximately 315 units generally located at 1420 Ambassador St., Los Angeles, CA 90035.

6. "**Indian Oaks**," a multi-dwelling residential apartment complex with approximately 770 units generally located at 5505 Cochran St., Simi Valley, CA 93063.

7. "**Indigo Apartments**," a multi-dwelling residential apartment complex with approximately 463 units generally located at 675 Bradford Street, Redwood City, CA 94063.

8. "**Island Club Apartments**," a multi-dwelling residential apartment complex with approximately 592 units generally located at 2300 Catalina Cir., Oceanside, CA 92056.

9. "**Laurel Crossing Apartment Homes**," a multi-dwelling residential apartment complex with approximately 418 units generally located at 203 Laurie Meadows Dr., San Mateo, CA 94403.

10. "**Lincoln Place**," a multi-dwelling residential apartment complex with approximately 795 units generally located at 1050 Frederick St., Venice, CA 90291.

11. "**Malibu Canyon**," a multi-dwelling residential apartment complex with approximately 698 units generally located at 5758

Las Virgenes Rd., Calabasas, CA 91302.

12. "**Mariners Cove Apartments**," a multi-dwelling residential apartment complex with approximately 500 units generally located at 4392 W Point Loma Blvd., San Diego, CA 92107.

13. "**Monterey Grove**," a multi-dwelling residential apartment complex with 224 units generally located at 6100 Monterey Rd., San Jose, CA 95138.

14. "**Ocean House on Prospect Apartment Homes**," a multi-dwelling residential apartment complex with approximately 53 units generally located at 400 Prospect St., La Jolla, CA 92037.

15. "**Pacific Bay Vistas Apartments**," a multi-dwelling residential apartment complex with approximately 308 units generally located at 2 Pacific Bay Cir., San Bruno, CA 94066.

16. "**Pacifica Park Apartments**," a multi-dwelling residential apartment complex with approximately 104 units generally located at 670 Hickey Blvd., Pacifica, CA 94044.

17. "**Palazzo East Apartments**," a multi-dwelling residential apartment complex with approximately 611 units generally located at 348 S. Hauser Blvd., Los Angeles, CA 90036.

18. "**Palazzo West**," a multi-dwelling residential apartment complex with approximately 521 units generally located at 6220 W. 3rd St., Los Angeles, CA 90036.

19. "**Point Bonita**," a multi-dwelling residential apartment complex with approximately 294 units generally located at 250 Bonita Glen Dr., Chula Vista, CA 91910.

20. "**Preserve at Marin**," a multi-dwelling residential apartment complex with approximately 126 units generally located at 350 Robin Dr., Corte Madera, CA 94925.

21. “**Saybrook Pointe**,” a multi-dwelling residential apartment complex with approximately 324 units generally located at 401 Briar Ridge Drive, San Jose, CA 95123.

22. “**The Bluffs at Pacifica Apartments**,” a multi-dwelling residential apartment complex with approximately 64 units generally located at 380 Esplanade Ave., Pacifica, CA 94044.

23. “**Villas at Park La Brea**,” a multi-dwelling residential apartment complex with approximately 250 units generally located at 5555 W 6th St., Los Angeles, CA 90036.

24. “**Villas of Pasadena**,” a multi-dwelling residential apartment complex with approximately 92 units generally located at 300 E Bellevue Dr., Pasadena, CA 91101.

16. Collectively, the above-referenced apartment complexes shall be referred to herein as the “APARTMENT COMPLEXES.”

17. Plaintiffs are informed and believe, and thereupon aver, that as the landlord for each of the complexes, Defendants exercise substantial control and ownership over nearly every aspect of each APARTMENT COMPLEX as part of their property management services, including, but not limited to, holding and maintaining the tenants’ security deposits throughout their tenancy. Upon a tenant vacating the leasehold, Defendants retain complete control to administer the return of the former tenant’s security deposit (if any remains unexhausted), unilaterally determine the amount to deduct in their sole discretion, perform work or arrange third-party vendors to perform work on vacated leaseholds, and also have the discretion to pursue collection of the former tenants for any amounts owed in excess of the exhausted security deposit.

18. Upon information and belief, all putative class members resided in California at the time their causes of action accrued, more than two-thirds of

putative class members continue to reside in California, all injuries complained of herein occurred within California, and Defendants own property in California and/or primarily do business in California.

19. Plaintiffs are informed and believe and thereupon aver that Defendants have substantially identical officers and directors as all other Defendants; use the same offices and business locations as all other Defendants; employ the same employees and attorneys as all other Defendants; are in the same business and venture, for the benefit of the same ultimate shareholders and members, as all other Defendants; maintain arm's-length relationships with all other Defendants; and share and provide labor, services, capital, revenue, real estate and/or management services with/for all other Defendants. Thus, any distinction between any of the entities is in name only.

20. AIR schedules and coordinates both in-house and outside vendors to perform work on vacated units, and directly oversees the charges applied against the tenants' security deposits.

21. Defendants directly perform a substantial amount of work on former tenants' vacated units, and then unilaterally deduct the charges from those former tenants' security deposits without adhering to the requirements of California Civil Code section 1950.5(h)(2)(B).

22. Plaintiffs are informed and believe and thereupon aver that DOES 1 through 500 are other natural persons, corporations, limited-liability companies, general partnerships, limited partnerships, limited-liability partnerships, trusts, unincorporated associations, and/or other entities of any kind or character who have incurred liability to Plaintiffs (and/or to one or more members of the Plaintiff Class) in relation to the transactions and/or occurrences that are the subject of this Third Amended Complaint ("TAC"), or who have any interest in the subject of this operative complaint.

23. Except as may be described here, Plaintiffs are yet uninformed of the

true names, capacities and nature and extent of participation in the course of conduct alleged here of the persons sued as DOES 1 through 500 inclusive. Plaintiffs are yet uninformed of the nature and extent of any interest that the persons sued as DOES 1 through 500 inclusive may have in the subject of the TAC. Plaintiffs therefore sue these defendants by fictitious names. Plaintiffs will amend the TAC to allege the true names and capacities of the DOE defendants when ascertained.

24. Upon information and belief, each of the Defendants named here, including DOES 1 – 500 and their alter egos, are joint tortfeasors, in joint enterprise, co-conspirators, and acting within the scope of their agency, their actual, and their apparent authority to conduct themselves in a manner complained herein.

25. Upon information and belief, each of the Defendants named here, including DOES 1 – 500 and their alter-egos, acted as an owner, principal, agent, employer, employee, joint employer, joint venturer, franchisor, franchisee, shareholder, director, member, co-conspirator, shell, conduit, master, or partner of each other, and at all times were acting within the scope and course and in purchase on their or its agency, employment, joint employment, joint venture, franchise, partnership, common and joint enterprise, or actual or apparent authority in concert with each other.

26. Upon information and belief, each of the Defendants named here, including DOES 1 - 500 and their alter-egos, are individually, jointly, and severally liable to Plaintiffs and the Plaintiff Class because each Defendant directly or indirectly, or through an agent or employee, actually, proximately and vicariously caused injury to Plaintiffs as described here.

27. Upon information and belief, the acts and omissions of each of the Defendants named here, including DOES 1 – 500 and their alter-egos, contributed to the acts and omissions of every other Defendant in proximately causing the complaints, injuries, and damages alleged. Defendants approved of, condoned,

and/or otherwise ratified each of the acts or omissions complained of. Defendants aided and abetted the acts and omissions of each other Defendant, including DOES 1 – 500 and their alter-egos, in proximately causing the complaints, injuries, and damages alleged.

## GENERAL ALLEGATIONS

28. At all relevant times, AIR served as the landlord for each of the APARTMENT COMPLEXES it performs property management services for, including, but not limited to, the collection, administration, disposition, and otherwise control of tenants' security deposits.

29. AIR directly collected each of the Plaintiffs' security deposits and generally directly collects security deposits from all tenants of the APARTMENT COMPLEXES.

30. AIR managed and exercised control over the bank accounts of the financial institutions where each of the security deposits were held.

31. AIR unilaterally inspects vacated units and, in its sole discretion, determines the charges to deduct from former tenants' security deposits.

32. AIR sets up and operates dedicated websites for each of the APARTMENT COMPLEXES.

33. AIR employs leasing professionals who work at each of the APARTMENT COMPLEXES.

34. AIR manages approximately 24 APARTMENT COMPLEXES in California and collects significant rental income. As a matter of standard operating policy, AIR routinely withholds security deposits by charging tenants for unsubstantiated, unnecessary, or unperformed work contrary to California law. This systemic practice unlawfully maximizes profits through improper deductions, irrespective of unit condition.

35. AIR has adopted a standardized policy that result in unlawful deductions from its former tenants' security deposits, regardless of the actual

condition of each returned unit.

36. AIR has gained immediate monetary benefit from employing and implementing these unlawful policies and practices and continues to reap ongoing and future monetary benefits. In effect, AIR has turned their tenants' security deposits into an additional profit center, exploiting these funds once those tenants vacate their respective leaseholds.

37. AIR directly manages, controls, and oversees all aspects of the income and expenses generated at each of the AIR APARTMENT COMPLEXES, including the security deposits. AIR is the primary point of contact and is viewed as the entity responsible for all aspects of each APARTMENT COMPLEX, including the administration of security deposits.

38. The APARTMENT COMPLEXES are subject to AIR's uniform, systemic, and unlawful administration of residential security deposit policies and procedures. AIR, in bad faith, retains security deposit funds from the class of residential tenants that reside in its APARTMENT COMPLEXES in clear violation of California law.

39. The California Civil Code sets forth specific requirements for the handling of security deposits upon termination of a residential lease.

40. Section 1950.5(b) provides that a landlord may only use a security deposit to satisfy charges against a former tenant for: (1) rent in arrears; (2) repairs *exclusive* of wear and tear; (3) cleaning required to bring the leasehold back to the condition it was in *when the tenant accepted the tenancy*; and (4) "[t]o remedy future defaults by the tenant in any obligation under the rental agreement to restore, replace, or return personal property or appurtenances" if provided for in the lease. Section 1950.5(e) provides that "the landlord may claim of the security *only* those amounts as are reasonably necessary for the purposes specified in subdivision (b)." (emphasis added).

41. Section 1950.5(d) states that "[a]ny security shall be held by the

landlord *for the tenant* who is party to the lease or agreement. The claim of a tenant to the security *shall be prior to the claim of any creditor of the landlord*." (emphasis added).

42. Section 1950.5(e)(2)(A) also provides, "[t]he landlord *shall not* assert a claim against the tenant or the security for damages to the premises or any defective conditions that preexisted the tenancy, for ordinary wear and tear or the effects thereof, whether the wear and tear preexisted the tenancy or occurred during the tenancy, or for the cumulative effects of ordinary wear and tear occurring during any one or more tenancies." (emphasis added).

43. Section 1950.5(f)(1) provides that before the end of the lease term of notification of the end of the lease term, "the landlord *shall* notify the tenant in writing of the tenant's option to request an initial inspection and of the tenant's right to be present at the inspection." (emphasis added).

44. Section 1950.5(h) provides that, to properly make deductions from a security deposit greater than $125.00, the deductions must be documented as follows:

1. Section 1950.5(h)(1) requires a landlord to return the balance of a tenant's security deposit, together with an itemized statement of its disposition, within 21 days after the tenant vacates the leasehold. More specifically, section 1950.5(h)(1) provides, in pertinent part, that no later than 21 calendar days after the tenant vacates the premises, the landlord "shall furnish the tenant, by personal delivery or by first-class mail, postage prepaid, a copy of an itemized statement indicating the basis for, and the amount of, any security received and the disposition of the security, and shall return any remaining portion of the security to the tenant."
2. Section 1950.5(h)(2) describes the disclosures and substantiation required to be sent to former tenants for charges levied against security

deposits.

a. Section 1950.5(h)(2)(A) requires that "[i]f the landlord or landlord's employee did the work, the itemized statement shall reasonably describe the work performed. The itemized statement shall include the time spent and the reasonable hourly rate charged."

b. Section 1950.5(h)(2)(B) requires that "[i]f the landlord or landlord's employee did not do the work, the landlord shall provide the tenant a copy of the bill, invoice, or receipt *supplied by the person or entity performing the work*. The itemized statement shall provide the tenant with the name, address, and telephone number of the person or entity, if the bill, invoice, or receipt does not include that information." (emphasis added.)

c. Section 1950.5(h)(2)(C) requires that "[i]f a deduction is made for materials or supplies, the landlord shall provide a copy of the bill, invoice, or receipt. If a particular material or supply item is purchased by the landlord on an ongoing basis, the landlord may document the cost of the item by providing a copy of a bill, invoice, receipt, vendor price list, or other vendor document that reasonably documents the cost of the item used in the repair or cleaning of the unit."

45. Section 1950.5(h)(7) provides that the landlord shall not be entitled to claim *any* amount of the security deposit if the landlord, in bad faith, fails to comply with this subdivision.

46. Section 1950.5(m) provides that the bad faith claim or retention by a landlord or the landlord's successors in interest of the security or any portion thereof in violation of this section may subject the landlord or the landlord's

successors in interest to statutory damages of up to twice the amount of the security, in addition to actual damages.

47. Section 1950.5(n) provides no portion of a security deposit may be deemed non-refundable by operation of the lease.

48. AIR charges for repairs, replacement, and cleaning that were not performed or substantiated; a practice obscured by intentionally failing to itemize and substantiate repairs, replacement, and cleaning as required under California law. As such, Plaintiffs, former California tenants of Defendants, have each been deprived of some or all of their security deposits which Defendants were legally obligated to return to their tenants at the conclusion of their respective leases.

49. AIR directs all tenants of the APARTMENT COMPLEXES to send their complaints, concerns, rent checks and security deposits to AIR, its employees, agents, and/or co-conspirators.

50. Defendants unlawfully retain former tenants' security deposits via AIR's standardized practice and policy of billing former tenants for normal wear and tear; and, charging former tenants fees for labor and services that were not performed, not required, and moreover not substantiated by documentation as required under California law. These excessive, unsubstantiated, unwarranted, unenforceable, unfair, unlawful and/or fraudulent charges; the subsequent withholding of security deposits from these former tenants; and the efforts to collect these charges over and above the former tenants' security deposits by standard practice, and irrespective of the condition of the former tenant's unit condition form the gravamen of this operative complaint.

51. Defendants' unreasonable, excessive, unlawful, unfair, unenforceable and/or unsubstantiated charges made against former tenants' security deposits often exceed the amount of the deposit held by Defendants. When this occurs, Defendants cause a bill, and sometimes a collections notice, to be sent to former tenants, knowing that the monies claimed are based upon fraudulent, unreasonable, excessive,

unlawful, unenforceable and/or unsubstantiated move-out charges, causing harm to its former tenants' credit and reputation, and otherwise defaming them.

52. Additionally, Defendants apply these same standardized processes to avoid repayment of some or all of the former tenants' security deposit and/or retaining some or all of the former tenants' security deposit beyond the 21-day period mandated by California law. This conduct has resulted in damages to Plaintiffs and other former residential tenants of the APARTMENT COMPLEXES both through the nonpayment of full security deposit amounts owed to tenants within 21-days of move-out and through the collection of such amounts and by the reporting of such alleged debts to third-parties, defaming former tenants, damaging their credit and impairing, among other things, their ability to rent other apartments.

53. AIR's standard operating procedures for the administration of its former tenants' security deposits uniformly and systematically violate Civil Code sections 1950.5(h)(1) and (h)(2). Specifically, as a matter of standard policy and practice, AIR does not provide tenants with bills, receipts, or invoices from the third-party vendors it alleges performed work on the vacated premises.

54. Additionally, AIR, as a matter of standard policy and practice for each of its 24 APARTMENT COMPLEXES, does not describe the work to any tenant allegedly performed on the leasehold in the manner required by law. AIR fails to provide required statements and uses unlawfully vague descriptions—a uniform practice designed to obfuscate the work, if any, performed on a leasehold, who performed the work, and the cost and/or labor of the work with the intention of wrongfully maximizing security deposit retention, therefore further increasing AIR's profitability.

55. AIR actively interferes with the mandated invoicing process by deliberately not providing the vacating tenants with any invoices for work purportedly done on their units by third-party vendors, even though the vacating tenants pay the vendors through deductions from their security deposits.

*Palazzo West – Marc Phelps*

56. Plaintiff **MARC PHELPS** ("Mr. PHELPS") is a former resident of Defendants, formerly residing at one of Defendants' properties generally doing business as "Palazzo West" an approximate 521-unit apartment complex located at 6220 W. 3rd St. Los Angeles, CA 90036. Mr. Phelps leased a 2-bedroom, 2-bathroom, apartment from Defendants at a rate of $4,247.00 per month, beginning on or about November 6, 2023. Mr. PHELPS' lease with AIR required a security deposit of approximately $1,500.00, which he paid.

57. Mr. PHELPS vacated his apartment on August 1, 2024. Two weeks after vacating, Mr. PHELPS received the following two documents via email on August 15, 2024 from AIR regarding the disposition of his security deposit:

- A "Statement" stating Mr. Phelps owed AIR $1,438.71; and
- A "Charge Details" document dated August 5, 2024, listing:
  - Description – "Damage Charges"
  - Amount – "$160.00"
  - Notes – "Work Order Fees Fee [sic] Posted / Other – Specify Charge."

58. According to the "Statement," AIR deducted the following:

- $485.75 for "Full Paint Monaco Premier;"
- $185.00 for "Full Clean Monaco Premier;"
- $160.00 for "Other – Specify Charge;"
- $5.50 for "Monthly, Srvc Fee, 5/20/24-06/20/24, Conserv, Acct # 36046494;"
- $5.50 for "Final Srvc Fee, Conserv, Acct # 36046494;"
- $58.30 for "Monthly, Sewer, 05/20/24-06/20/24, Conserv, Acct # 36046494;"
- $61.09 for "Final Sewer, 06/21/24-08/01/24, Conserv, Acct #

36046494;"

- $98.60 for "Monthly, Water, 05/20/24-06/20/24, Conserv, Acct # 36046494;"
- $97.04 for "Final Water, 06/21/24-08/01/24, Conserv, Acct # 36046494;"
- $2.22 for "Monthly, Pest Control, 05/20/24-06/20/24, Conserv, Acct # 36046494;"
- $2.91 for "Final Pest Control, 06/21/24-08/01/24, Conserv, Acct # 36046494;"
- $8.69 for "Monthly, Energy Conservation Fee, 05/20/24-06/20/24, Conserv, Acct # 36046494;"
- $8.69 for "Final Energy Conservation Fee, 06/21/24-08/01/24, Conserv, Acct # 36046494;"
- $2.83 for "Monthly, Systematic Code Enforcement, 05/20/24-06/20/24, Conserv, Acct # 36046494;"
- $3.71 for "Final Systematic Code Enforcement, 06/21/24-08/01/24, Conserv, Acct # 36046494;"
- $154.00 for "RENT;"
- $42.76 for "Monthly, Trash, 05/20/24-06/20/24, Conserv, Acct # 36046494;" and
- $56.12 for "Final Trash, 06/21/24-08/01/24, Conserv, Acct # 36046494."

59. AIR did not send Mr. PHELPS any photographs prior to any deductions for cleaning and painting.

60. That same day, Mr. PHELPS emailed AIR seeking further clarification on the vague charges. Mr. PHELPS emailed AIR, stating:

> *Hi Christy, could you explain the painting, cleaning, and "other" charge please, as I understand it basic cleaning and painting is normal and should be included. Also the other charge is not specified, thank you. Marc.*

61. Receiving no response, Mr. PHELPS emailed AIR again on September 4, 2024 stating:

> *Hello Team: I'm following up on the below message to which I did not receive a reply.*
>
> *Per Cal. Civil Code Section 1950.5, a landlord may only deduct from the security deposit for damage or cleaning beyond normal wear and tear.*
>
> *Accordingly please remit a check for $485.75 (damage charges – paint), $185.00 (cleaning charges), and $160.00 ("other").*
>
> *I have photos of the condition of the apartment as I left it which was in a normal state that would not exceed normal wear and tear. No trash was left behind.*
>
> *In the alternative please provide an explanation of why these deductions were made along with photos/evidence of the claimed damage.*
>
> *This is in regard to Lease 14777018, Unit 1-106 at Palazzo West.*
>
> *Thank you,*
>
> *Marc*

62. Defendant AIR never responded, and Mr. PHELPS has received no further vendor bills, invoices, receipts, or other documentation substantiating the charges itemized in the "Statement" AIR sent him.

63. On or around September 6, 2024, Mr. PHELPS received a refund check for $61.29.

64. According to AIR's internal "Resident Activity" records, kept in the ordinary course of business, Mr. PHELPS' refund check was not mailed from Denver, Colorado until August 28, 2024 – six days after the 21-day deadline prescribed by California Civil Code section 1950.5(h)(1).

*Hidden Cove II – Brooke Benner*

65. Plaintiff **BROOKE BENNER** ("Ms. BENNER") is a former resident of Defendants, formerly residing at one of Defendants' properties generally doing business as "Hidden Cove II" an approximate 334-unit apartment complex located

at 1575 Tanglewood Lane, Escondido, CA 92029. Ms. BENNER leased an apartment, Unit 118, from Defendants at a rate of $2,509.00 per month, beginning on or about November 30, 2019. Ms. BENNER's lease with AIR required a security deposit of $750.00, which she paid.

66. Ms. BENNER vacated her apartment on July 28, 2025. On or about July 31, 2025, Ms. BENNER received a "Move Out Statement" dated July 31, 2025 from AIR regarding the disposition of her security deposit.

67. According to the "Move Out Statement," AIR claimed Ms. BENNER owed an outstanding balance of $4,486.52, which included the retention of her entire $750.00 security deposit. The statement listed charges including, but not limited to:

- $395.00 for "Damage Charges – Paint";
- $1,920.00 for "Damage Charges – Drywall Damage";
- $200.00 for "Cleaning Charges – Major Drywall Damage";
- $350.00 for "Cleaning Charges – Entry Door Jam/Hardware/Locks";
- $500.00 for "Cleaning Charges – Tub/Shower" (two separate charges of $250.00 each);
- $275.00 for "Cleaning Charges – Countertops";
- $175.00 for "Cleaning Charges – General Cleaning – Full Clean";
- $480.00 for "Cleaning Charges – Kitchen Cabinets – Paint Cabinets";
- $175.00 for "Cleaning Charges – Flooring";
- $190.00 for "Cleaning Charges – Ceiling – Damage"; and
- $170.00 for "Cleaning Charges – Door Jam/Hardware/Locks."
- $8.40 for "Resident Liability Waiver Program."

68. On August 5, 2025, Ms. BENNER emailed AIR's "Customer Care After Move-Out" department seeking clarification on the charges. Ms. BENNER specifically requested photos of the drywall damage and questioned the $190.00 charge for "ceiling damage" and over $1,000.00 in cleaning charges, stating that the

charges appeared excessive.

69. On August 6, 2025, Ms. BENNER emailed AIR again, stating: "I will not be paying 5000$ [*sic*] for move out costs. You can negotiate with me or receive nothing. Also you never sent photos of the 2000$ drywall damage please send now."

70. On August 13, 2025, Ms. BENNER emailed AIR and asked: "Did you hire outside contractors or did you complete the repairs yourself? If you hired contractors will you please send me the invoices and if you completed the work yourself could you please send me an itemized list with the hourly rate thank you."

71. On August 14, 2025, AIR responded to Ms. BENNER's request for invoices, stating: "Our vendors completed the work. I will provide you with the invoices once they upload them to our records. Thank you for your patience while retrieve these for you."

72. On August 15, 2025, AIR further responded: "Invoices are processed by our accounting department at the time the statement is sent, but the costs are based on actual vendor estimates or standard contracted rates for the services performed." AIR thereby admitted that the move-out charges were not based on actual invoices or receipts from vendors who performed work, but rather on "estimates" or "standard contracted rates."

73. On May 4, 2026, more than nine months after her move-out, Ms. BENNER sent a formal demand letter to AIR demanding the return of her $750.00 security deposit, stating in relevant part:

- *This letter constitutes a formal demand for the return of my security deposit in the amount of $750, which you have wrongfully withheld following my vacating of the above-referenced property on 7/28/2025. It has now been more than 60 days since I vacated the unit. The deductions you applied to my deposit are improper and not supported by the condition of the property at the time of my move-out. When I*

*requested invoices and receipts for the work performed your company never sent them.*

74. To date, Ms. BENNER has received no refund of any portion of her $750.00 security deposit, nor any vendor bills, invoices, or receipts for any of the alleged work performed on her prior leasehold. AIR has failed to produce any description of the work performed, the time spent, or the hourly rate charged, despite Ms. BENNER's repeated written requests for compliance with Civil Code section 1950.5.

75. Defendants further caused Ms. BENNER's account to be reported to a third-party collections agency, thereby adversely affecting her creditworthiness and proximately causing her to suffer damages in an amount to be proven at trial.

76. The Civil Code sets forth requirements for the treatment of security deposits upon termination of a residential lease, *inter alia*, section 1950.5(b) provides that a landlord may only use a security deposit to satisfy charges against a former tenant for: (1) rent in arrears; (2) repairs *exclusive of wear and tear*; (3) cleaning required to bring the leasehold back to the condition it was in *when the tenant accepted the tenancy*; and (4) "to remedy future defaults by the tenant in any obligation under the rental agreement to restore, replace, or return personal property or appurtenances" if provided for in the lease.

77. Section 1950.5(h)(1) requires that the balance of security deposits and an itemization of their disposition must be provided to the departing tenant within 21 days of vacating the leasehold.

78. Section 1950.5(h)(2) describes the substantiation required to be sent to former tenants for charges levied against security deposits—a reasonable description of work performed by employees including hours worked and hourly rate charged; and, for work by vendors, copies of any bills, invoices, or receipts from the vendor(s) who performed work.

79. Section 1950.5(h)(7) provides that the landlord shall not be entitled to

claim any amount of the security deposit if the landlord, in bad faith, fails to comply with this subdivision.

80. Section 1950.5(n) provides that no portion of a security deposit may be deemed non-refundable by operation of the lease.

81. Defendants in this action systematically, uniformly, and in bad faith have violated the Civil Code to the detriment of thousands of Californians over many years by charging for repairs, replacement, and cleaning that were never done; a practice obscured by intentionally failing to itemize and substantiate repairs, replacement and cleaning by code, if they were done. As a result, Defendants have wrongfully retained portions or the entirety of former tenants' security deposits in violation of California law.

## CLASS ACTION ALLEGATIONS

82. Plaintiffs re-allege and incorporate by reference the allegations of all preceding paragraphs.

83. Plaintiffs bring this action as a class action pursuant to California Civil Code of Procedure section 382 on behalf of themselves and all other similarly situated persons in the Classes, which are composed of and defined as follows, excepting only individuals against whom or in whose favor a final judgment has already been rendered with respect to the defendant(s):

> **Unsubstantiated-Charges Class:** All former residents of Defendants' California properties whose leaseholds terminated between April 23, 2021, to present, who had more than $125 of their security deposit retained for cleaning, repairs, and/or replacements combined, and who are California residents (the "Plaintiff Class.").

> **Unauthorized Deduction Subclass:** All former residents of Defendants' California properties whose leaseholds terminated

between April 23, 2021, to present, who had a portion of their security deposit retained for a purpose not authorized by California Civil Code section 1950.5(e), and who are California residents (the "Plaintiff Subclass").

**Late Security Deposit Subclass:** All former residents of Defendants' California properties whose leaseholds terminated between April 23, 2021, to present, who did not receive any portion of the security owed to them within 21 days as required by California Civil Code section 1950.5(h)(1) (the "Plaintiff Subclass No. 2").

84. Plaintiffs reserve the right to amend this Class and to add any number of subclasses. The Court should permit this action to be maintained as a class action pursuant to California Code of Civil Procedure section 382 and Federal Rules of Civil Procedure, Rule 23 because:

1. **Numerosity:** The entire Plaintiff Class is so numerous that the individual joinder of all members is impracticable. Plaintiffs are informed and believe that there are thousands of class members in total, and a sufficiently numerous amount in the proposed class.
2. **Common Questions Predominate:** Common questions of law and fact exist as to all members of the class that predominate over any questions that affect only individual members. These common questions of law and fact include, but are not limited to the following:
    a. Whether Defendants enacted policies or engaged in a pattern and practice in violation of California Civil Code section 1950.5(h)(1) of failing to return any remaining portion of the security deposits to the respective former

tenants within 21 calendar days after the tenant vacates the premises.

b. Whether Defendants' policies or practices violated California Civil Code section 1950.5(h)(1) of failing to provide itemized statements detailing charges for repairs or cleaning deducted from security deposits of its former tenants within 21 days of move out.

c. Whether Defendants' policies or practices failed to provide copies of vendor-supplied bills, receipts or invoices for repairs or cleaning deducted from security deposits of its former tenants within 21 days of move out.

d. Whether the "Charge Details" document complies with California Civil Code section 1950.5(h)(2)(A)-(B).

e. Whether Defendants' uniform security deposit itemizations satisfy the requirements for any alleged "employee performed work" on vacated leaseholds under California Civil Code section 1950.5(h)(2)(A).

f. Whether Defendants' uniform security deposit itemizations satisfy the requirements for any alleged "vendor performed work" on vacated leaseholds under California Civil Code section 1950.5(h)(2).

g. Whether Defendants, by operation of law, are barred from seeking recovery for amounts which could legitimately have been charged at move out due to their systematic and bad faith violation of California Civil Code section 1950.5 and other equitable or statutory provisions of law.

h. Whether any and all Defendants are liable to each former tenant who is a class member for his or her actual

damages, plus twice the amount of the security for bad-faith retention of security deposits under California Civil Code section 1950.5(m).

i. The appropriate measure of class-wide legal and/or equitable relief.

3. **<u>Typicality:</u>** Plaintiffs' claims are typical of those of the Plaintiff Class. Plaintiffs and all Plaintiff Class members sustained injuries and damages arising from Defendants' common policies, practices and course of conduct, and those injuries and damages were caused directly by the Defendants' wrongful conduct in violation of law as alleged. The claims of the Plaintiffs are representative of the class as a whole, focusing on the systemic issues rather than the individual issues of each unit, as detailed in the common questions above.

4. **<u>Adequacy of Representation:</u>** Plaintiffs will fairly and adequately protect the interests of the members of the Plaintiff Class. Plaintiffs have no interests adverse to the interests of absent class members. Plaintiffs have retained counsel adequate to prosecute the case for the entire class.

5. **<u>Superiority:</u>** A class action is superior to other available means for the fair and efficient adjudication of this controversy since individual joinder of all members of the class is impracticable; class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, because Defendants are

expected to contend that any individual's damages may be relatively small, the expense and burden of individual litigation make it difficult or impossible for individual class members to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action. The cost to the judicial system of individual adjudication would be substantial and present the potential for inconsistent or contradictory judgments. In addition, individual actions give Defendants too many opportunities to take advantage of unrepresented tenants at a summary proceeding without access to substantial discovery, as discovery is not available in small claims court.

85. There are no difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

**<u>FIRST CLAIM FOR RELIEF</u>**

**Unlawful Retention of Residential Security Deposits**

**(California Civil Code § 1950.5)**

**(Against all Defendants)**

86. Plaintiffs re-allege and incorporates by reference the allegations of all preceding paragraphs.

87. This cause of action is brought against Defendants on behalf of Plaintiffs, the Plaintiff Class, and the Plaintiff Subclasses.

88. Defendants charged unsubstantiated cleaning, repair, replacement, and/or painting fees to Plaintiffs and the Plaintiff Class upon the termination of their leasehold and deducted these charges from their security deposits.

89. Defendants deducted charges and fees not authorized by California Civil Code section 1950.5(e) from Plaintiffs' and the Plaintiff Subclass' security

deposit.

90. Within 21 days of Plaintiffs and the Plaintiff Class vacating their respective leased premises, Defendants neither provided copies of the vendor bills, invoices, or receipts indicating the basis for and amount of any security deposit received and its disposition

91. Defendants did not return to Plaintiff Subclass No. 2 the portion of the security deposit they acknowledged should be returned within 21 days of the resident vacating the unit.

92. Defendants did not provide the requisite substantiation of the charges against Plaintiffs' and the Plaintiff Class' security deposits as required under California Civil Code section 1950.5(h)(2)(A)-(C).

93. Defendants, as a result of these charges, unlawfully retained some or all of Plaintiffs', Plaintiff Class', and the Plaintiff Subclass' security deposits.

94. Defendants engaged in the above-described misconduct in bad faith. As a direct and proximate cause of Defendants' conduct, Plaintiffs, the Plaintiff Class, and the Plaintiff Subclasses suffered damages, as prayed for below

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and other members of Plaintiff Class and Plaintiff Subclass, pray:

1. For actual damages sustained by Plaintiffs, the Plaintiff Class and Subclass members, including but not limited to, unlawfully retained security deposits; any amounts paid to Defendants over and above what was retained of their respective security deposits for unreasonable and unsubstantiated charges at move-out; plus any other amounts collected from Class members in connection with their leasehold termination for purported repairs, replacements, painting, carpet replacement or cleaning, accelerated rent,

rental concession charge-backs, and any other charges collected in violation of law;

2. For return of the entirety of all Plaintiffs', the Plaintiff Class', and Plaintiff Subclass' security deposits retained by Defendants;
3. For penalties available pursuant to California Civil Code section 1950.5(m);
4. For restitution for violation of California Business and Professions Code sections 17200 *et seq*.;
5. For pre-judgment interest;
6. For attorney's fees and expenses recoverable under law, including, without limitation, Code of Civil Procedure 1021.5;
7. For costs, including class action notice and administration expenses;
8. Any other relief that this Court deems just and proper.

Dated: July 7, 2026 **HOGUE & BELONG**

By: s/ *Jeffrey Hogue*
Attorney for Plaintiffs
E-mail: jhogue@hoguebelonglaw.com

## JURY DEMAND

Plaintiffs and ROES 1 through 100, individually and on behalf of the other members of the Plaintiff Class, hereby demand trial by jury of all issues triable by a jury, pursuant to applicable law, including, but not necessarily limited to Article I, ¶16 of the California Constitution, and/or § 592 of the California Code of Civil Procedure.

Dated: July 7, 2026 **HOGUE & BELONG**

By: s/ *Jeffrey Hogue*
Attorney for Plaintiffs
E-mail: jhogue@hoguebelonglaw.com